FILED
*Feb 20, 2013*
FEB 20 2013

JUDGE VIRGINIA M. KENDALL
U.S DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) No. 13 CR 137 |
| v. | ) |
| | ) Honorable Virginia Kendall |
| GROEB FARMS, INC. | ) |
| | ) *Deferred Prosecution Agreement* |

Defendant GROEB FARMS, INC., a Michigan corporation with its principal place of business in Onsted, Michigan, by and through its undersigned attorney, pursuant to authority granted by its Board of Directors, and the United States Attorney's Office for the Northern District of Illinois, enters into this Deferred Prosecution Agreement. The terms and conditions of this Agreement are as follows:

## The Criminal Information

1.    GROEB FARMS waives indictment and agrees to the filing of a one-count Information in the United States District Court for the Northern District of Illinois, charging that on or about January 25, 2010, in the Northern District of Illinois, Eastern Division and elsewhere, GROEB FARMS, as part of a fraudulent practice, received and bought merchandise, namely, twenty-two container loads of Chinese-origin honey with a contract value of $882,178, knowing the same to have been imported and brought into the United States contrary to law, namely, as part of a fraudulent practice in violation of Title 18, United States Code, Section 542, in that the honey was falsely and fraudulently imported and brought into the United States described as Chinese honey syrup, some of which was transported through the Northern District of Illinois and later delivered into the Northern District of Illinois as finished product, in violation of Title 18, United States Code, Sections 545 and 2. A copy of the Information is attached as Appendix A.

## Acceptance of Responsibility

2.    GROEB FARMS accepts and acknowledges responsibility for its conduct and that of its current and former executives and employees as set forth in the Factual Statement attached hereto and incorporated by reference herein as Exhibit A, as well as the additional conduct set forth in the Factual Statement,

1

which constitutes relevant conduct under United States Sentencing Guidelines §1B1.3. GROEB FARMS agrees that it shall not contest or otherwise challenge the admissibility into evidence of the Factual Statement, the facts contained within the Factual Statement, or any other document, testimony, or other evidence the USAO NDIL might use in any related criminal prosecution against GROEB FARMS in the event of a material breach of this Agreement.

## Cooperation

3.     GROEB FARMS agrees to cooperate fully with the USAO NDIL and with any other agency with which the USAO NDIL requests GROEB FARMS to cooperate, regarding any matter about which GROEB FARMS has knowledge. GROEB FARMS' agreement to cooperate shall extend until the completion of law enforcement investigations of any criminal activity relating to the illegal importation and entry of honey into the United States, including any investigations or prosecutions of others, but in no event shall that cooperation be less than the duration of this Agreement, that is, twenty-four months.

4.     GROEB FARMS agrees that its cooperation, as agreed to in Paragraph 3 of this Agreement, shall include, but is not limited to, the following, although GROEB FARMS' cooperation shall not include production of materials covered by the attorney-client privilege or the work product doctrine:

(a)     Completely and truthfully disclosing all information as may be requested by the USAO NDIL with respect to the activities of GROEB FARMS and its present and former board of directors, agents, officers, executives, and employees, as well as any brokers, counter parties, other third parties, and customers concerning all matters inquired into by the USAO NDIL;

(b)     Assembling, organizing, and timely providing on request from the USAO NDIL all documents, records, or other tangible evidence in GROEB FARMS' possession, custody, or control;

(c)     Using its best efforts to make available its present and former board of directors, agents, officers, executives, and employees to provide information and/or testimony as requested by the USAO NDIL, including sworn testimony before a federal grand jury or in federal trials, as well as interviews with federal law enforcement authorities.  Cooperation under this Agreement will include identification of witnesses who, to GROEB FARMS' knowledge and belief, may have material information regarding the matters under investigation;

2

(d)    Providing testimony and other information deemed necessary by the USAO NDIL or a court to identify or establish the original location, authenticity, or other evidentiary foundation necessary to admit into evidence documents in any criminal or other proceeding as requested by the USAO NDIL; and

(e)    Disposing on a voluntary basis and according to law any illegally transshipped, illegally misdeclared, or illegally entered Chinese-origin honey, whether in raw, blended, or finished form, of which GROEB FARMS has knowledge and which resides in GROEB FARMS' possession, custody, or control.

### Fine

5.    GROEB FARMS agrees to pay $2,000,000 to the United States as a monetary penalty within thirty days of the filing of this Agreement in Court. If GROEB FARMS fails to fulfill its obligations to pay the penalty and is deemed in default under the terms of this Agreement, GROEB FARMS agrees and stipulates to the entry of a judgment against it for the unpaid amount and shall fully cooperate in that process. The parties have agreed to the penalty based on GROEB FARMS' financial ability to pay, as confirmed by financial statements and other representations made by GROEB FARMS and its representatives to the United States, under penalty of perjury and prosecution for false statements. GROEB FARMS understands that any misrepresentations concerning its financial status would constitute a material breach of this Agreement.

6.    If GROEB FARMS materially breaches this Agreement as determined by the USAO NDIL within its exclusive discretion, any monies paid by GROEB FARMS to the United States shall not be returned to GROEB FARMS and any outstanding sums still owed to the United States shall remain due to the United States. The USAO NDIL agrees, however, to recommend to the Court that the amount paid pursuant to this Agreement should be offset against whatever fine the Court shall impose as part of its judgment in the event of a subsequent prosecution against GROEB FARMS.

### Deferral of Prosecution

7.    In consideration of GROEB FARMS' cooperation, as well its remedial actions to date, and its willingness to (i) accept and acknowledge responsibility for the conduct of its current and former executives, employees, and agents as detailed in the Factual Statement; (ii) have already implemented and continue further implementation of new, enhanced remedial actions as specified in Exhibit B; (iii) demonstrate its future good conduct and full compliance with U.S. importation

3

laws, the Food, Drug, and Cosmetic Act ("FDCA"), and other federal laws; (iv) educate customers and other industry participants regarding illegally transshipped, illegally misdeclared, and unsafe or unwholesome products, including honey; (v) continue its cooperation with the USAO NDIL, law enforcement, and other government agencies as specified in Paragraphs 3 and 4; (vi) volunteer to dispose according to law any honey specified in Paragraph 4(e); and (vii) pay the monetary penalty set forth in Paragraph 5, the USAO NDIL shall recommend to the Court, pursuant to Title 18, United States Code, Section 3161(h)(2), that prosecution of GROEB FARMS on the Information filed pursuant to Paragraph 1 be deferred for a period of twenty-four months from the date of the Court's Order. Specifically, upon execution of this Agreement, and pursuant to Title 18, United States Code, Section 3161(h)(2), the USAO NDIL shall move, unopposed by GROEB FARMS, to present this Agreement to the Court and move for a continuance of all further criminal proceedings, including trial, for a period of twenty-four months, for speedy trial exclusion of all time covered by such a continuance, and for approval by the Court of this deferred prosecution.

8.    The USAO NDIL agrees that if GROEB FARMS has not committed a material breach of this Agreement for twenty-four months from the date of the Court's Order deferring prosecution, the USAO NDIL shall seek dismissal with prejudice of the Information filed against GROEB FARMS pursuant to Paragraph 1, and this Agreement shall expire and be of no further force or effect.

## Government Commitment

9.    Except in the event of a material breach of this Agreement, during the term of this Agreement and upon expiration of this Agreement as set forth in Paragraph 8, the USAO NDIL shall not further pursue investigations relating to the matters set forth in the Factual Statement that have been, or could have been, conducted by the USAO NDIL prior to the date of this Agreement as to GROEB FARMS.

## Court Not Bound

10.    GROEB FARMS and the USAO NDIL understand that the Agreement to defer prosecution of GROEB FARMS must be approved by the Court, in accordance with Title 18, United States Code, Section 3161(h)(2). Should the Court decline to approve this Agreement for any reason, both the USAO NDIL and GROEB FARMS are released from any obligation imposed upon them by this Agreement and this Agreement shall be null and void.

4

## Waiver of Rights

11.     GROEB FARMS agrees to waive and hereby expressly waives all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Northern District if Illinois for the period that this Agreement is in effect.

12.     In case of a material breach of this Agreement, any prosecution of GROEB FARMS relating to the information and facts contained in the Factual Statement or any crime arising therefrom that is not time-barred by the applicable statute of limitations as of the date of this Agreement, may be commenced against GROEB FARMS notwithstanding the expiration of any applicable statute of limitations during the deferred prosecution period and up to the determination of any material breach and for one year thereafter. Thus, by signing this Agreement, GROEB FARMS agrees that the statute of limitations with respect to any related prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the period of this Agreement plus one year. GROEB FARMS' waiver of the statute of limitations is knowing and voluntary and in express reliance on the advice of counsel. Upon the successful completion of this Agreement, all applicable statutes of limitations shall be in effect.

## Breach of this Agreement

13.     Should the USAO NDIL determine that GROEB FARMS has committed a material breach of any provision of this Agreement, the USAO NDIL shall provide written notice to GROEB FARMS of the alleged breach, and provide GROEB FARMS with a thirty day (30) period, or longer at the reasonable discretion of the USAO NDIL, in which to make a presentation to the USAO NDIL, to demonstrate that no material breach has occurred, or, to the extent applicable, has been cured. The parties expressly understand and agree that should GROEB FARMS fail to request an opportunity to present facts in mitigation within a two-week period of the potential breach, it shall be conclusively presumed that GROEB FARMS is in material breach of this Agreement. The parties further understand and agree that the USAO NDIL's exercise of discretion under this Paragraph is not subject to review in any court or tribunal outside of the Department of Justice. In the event of a material breach of this Agreement that results in a prosecution of GROEB FARMS, such prosecution may be premised upon any information of which law enforcement is aware as well as any information provided by or on behalf of GROEB FARMS to the USAO NDIL or any other government agency. As set forth in Paragraph 2 of this Agreement, GROEB

FARMS shall not contest or otherwise challenge the admissibility into evidence of the Factual Statement, the facts contained within the Factual Statement, or any other document, testimony, or other evidence the USAO NDIL might use in any criminal prosecution against GROEB FARMS in the event of a material breach of this Agreement.

## Requirement to Obey the Law

14.    Should the USAO NDIL determine during the term of this Agreement that GROEB FARMS has committed any federal crime commenced subsequent to the date of this Agreement, GROEB FARMS shall, in the sole discretion of the USAO NDIL, thereafter be subject to prosecution for any federal crimes of which the USAO NDIL has knowledge, including but not limited to the conduct described in the Factual Statement.

## Public Statements

15.    GROEB FARMS expressly agrees that it shall not, through its present or future attorneys, board of directors, agents, officers, executives, or employees, make any public statement contradicting any statement of fact contained in the Factual Statement. Any such contradictory public statement by GROEB FARMS, its attorneys, board of directors, agents, officers, executives, or employees shall constitute a material breach of this Agreement as governed by Paragraph 13 of this Agreement, and GROEB FARMS shall thereafter be subject to prosecution pursuant to the terms of this Agreement.

16.    The decision of whether any statement subject to Paragraph 15 of this Agreement contradicts a fact contained in the Factual Statement and should be imputed to GROEB FARMS for purposes of determining whether GROEB FARMS has breached this Agreement shall be in the sole and reasonable discretion of the USAO NDIL. Upon the government's notification to GROEB FARMS of a public statement by any such person that in whole or in part contradicts a statement of fact contained in the Factual Statement, GROEB FARMS may avoid a breach of this Agreement by publicly repudiating such statement within two business days after notification by the government. This Paragraph is not intended to apply to any statement made by any individual in the course of any criminal, regulatory, or civil case initiated by a governmental or private party against such individual. In addition, consistent with GROEB FARMS' obligation not to contradict any statement of fact set forth in the Factual Statement, GROEB FARMS may take good faith positions in litigation involving any person or entity not a party to this Agreement. Nothing stated in this Agreement is intended to operate or shall operate as a waiver of GROEB FARMS' rights under Federal Rule of Evidence 408.

## Additional Terms

17. GROEB FARMS agrees that, if GROEB FARMS' business operations are sold to a party or parties affiliated or unaffiliated with GROEB FARMS as of the date of this Agreement, whether by sale of stock, merger, consolidation, sale of a significant portion of its assets, or other form of business combination, or otherwise undergoes a direct or indirect change of control during the term of this Agreement, GROEB FARMS shall include in any such contract or instrument a provision binding the purchaser/successor to all the obligations described in this Agreement.

18. It is further understood that this Agreement is binding on GROEB FARMS and the USAO NDIL, but specifically does not bind any other federal agencies, or any state or local authorities, although the USAO NDIL will bring the cooperation of GROEB FARMS and its compliance with its other obligations under this Agreement to the attention of federal, state, or local prosecuting offices or regulatory agencies, if requested by GROEB FARMS or its attorneys. It is understood that this Agreement also excludes any natural persons. It is the intent of the parties to this Agreement that the Agreement does not confer or provide any benefits, privileges or rights to any individuals or other entities other than the parties hereto, and that nothing in the Agreement shall be admissible in any proceeding other than a proceeding brought by the USAO NDIL. Moreover, GROEB FARMS may raise defenses and/or assert affirmative claims in any civil proceedings brought by private parties as long as doing so does not otherwise violate any term of this Agreement.

19. It is further understood that this Agreement does not relate to or cover any criminal conduct by GROEB FARMS other than the conduct described in the Factual Statement.

20. GROEB FARMS and the USAO NDIL agree that, upon acceptance by the Court, this Agreement and an Order deferring prosecution shall be publicly filed in the United States District Court for the Northern District of Illinois, Eastern Division.

21. This Agreement sets forth all the terms of the Deferred Prosecution Agreement between GROEB FARMS and the USAO NDIL. No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the USAO NDIL, GROEB FARMS' attorneys, and a duly authorized GROEB FARMS' representative.

22.    GROEB FARMS and its attorneys acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement to cause GROEB FARMS to enter into this Agreement.


AGREED:


FOR GROEB FARMS, INC.


FEB. 11 · 2013
_____
DATE

Rolf B.
_____
ROLF B. RICHTER
Chief Executive Officer
Duly Authorized Representative
GROEB FARMS, INC.


FOR THE UNITED STATES ATTORNEY'S OFFICE FOR THE
NORTHERN DISTRICT OF ILLINOIS


_____
DATE

_____
GARY S. SHAPIRO
United States Attorney
Northern District of Illinois


_____
ANDREW S. BOUTROS
Assistant United States Attorney


8

22. GROEB FARMS and its attorneys acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement to cause GROEB FARMS to enter into this Agreement.

**AGREED:**

**FOR GROEB FARMS, INC.**

_____
DATE

_____
ROLF B. RICHTER
Chief Executive Officer
Duly Authorized Representative
GROEB FARMS, INC.

**FOR THE UNITED STATES ATTORNEY'S OFFICE FOR THE NORTHERN DISTRICT OF ILLINOIS**

2 / 11 / 2013
_____
DATE

_____
GARY S. SHAPIRO
United States Attorney
Northern District of Illinois

_____
ANDREW S. BOUTROS
Assistant United States Attorney

8

## CERTIFICATE OF CORPORATE RESOLUTIONS

The undersigned Secretary of GROEB FARMS, INC., a Michigan corporation, hereby certifies that the following resolutions were duly enacted by the Board of Directors of GROEB FARMS on February 8, 2013, and that such resolutions remain in full force and effect:

WHEREAS, GROEB FARMS has been engaged in discussions with the United States Attorney's Office for the Northern District of Illinois to resolve criminal liability relating to its honey-related businesses; and

WHEREAS, in order to resolve such discussions, it is proposed that GROEB FARMS enter into a deferred prosecution agreement with the United States Attorney's Office for the Northern District of Illinois; and

WHEREAS outside counsel for GROEB FARMS has advised the Board of Directors of GROEB FARMS' rights, possible defenses, and the consequences of entering into such agreement with the United States Attorney's Office for the Northern District of Illinois;

Therefore, this Board hereby RESOLVES that:

1.      GROEB FARMS agrees and consents to the entry of the Deferred Prosecution Agreement with the United States Attorney's Office for the Northern District of Illinois;

2.      Outside counsel and GROEB FARMS' President and Chief Executive Officer are hereby authorized, empowered and directed, on behalf of GROEB FARMS, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as outside counsel may approve; and

3.      Outside counsel and GROEB FARMS' President and Chief Executive Officer are authorized, empowered and directed to take any and all actions as may be necessary or appropriate, and to approve the forms, terms, or provisions of any agreement or other documents as may be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing resolutions.


February 11, 2013
DATE

George Cawman
GEORGE CAWMAN
Chairman of the Board of Directors
GROEB FARMS, INC.

9

## OFFICER'S CERTIFICATE

I, ROLF B. RICHTER, the duly authorized representative of GROEB FARMS, INC., hereby expressly acknowledge the following: (1) I have the authority to sign this Deferred Prosecution Agreement; (2) I have read this entire Agreement; (3) I have had an opportunity to discuss this Agreement fully and freely with GROEB FARMS' attorneys; (4) GROEB FARMS fully and completely understands each and every one of its terms and the Agreement's consequences; (5) GROEB FARMS is fully satisfied with the advice and representation provided to it by its attorneys; and (6) GROEB FARMS has signed this Agreement voluntarily.

FEB. 11 · 2013
_____
DATE

_____
ROLF B. RICHTER
Chief Executive Officer
GROEB FARMS, INC.

10

## COUNSEL'S CERTIFICATE

The undersigned are outside counsel for GROEB FARMS, INC. In connection with such representation, I acknowledge that I: (1) discussed this Deferred Prosecution Agreement with my client, GROEB FARMS; (2) fully explained each one of its terms to GROEB FARMS; (3) fully answered each and every question put to me by GROEB FARMS regarding this Agreement; and (4) believe GROEB FARMS completely understands all of this Agreement's terms and its consequences.

FOLEY & LARDNER LLP

2/11/13
_____
DATE

_____
Lisa Noller
Counsel for GROEB FARMS, INC.

11

## Exhibit A

## FACTUAL STATEMENT

GROEB FARMS, INC. admits and agrees to the following facts and that those facts establish its guilt beyond a reasonable doubt and constitute relevant conduct pursuant to Guideline §1B1.3: On or about January 25, 2010, in the Northern District of Illinois, Eastern Division and elsewhere, GROEB FARMS, together with Executive A and Executive B, as part of a fraudulent practice, received and bought merchandise, namely, twenty-two container loads of Chinese-origin honey with a contract value of $882,178, knowing the same to have been imported and brought into the United States contrary to law, namely, as part of a fraudulent practice in violation of Title 18, United States Code, Section 542, in that the honey was falsely and fraudulently imported and brought into the United States described as Chinese honey syrup, some of which was transported through the Northern District of Illinois and later delivered into the Northern District of Illinois as finished product, in violation of Title 18, United States Code, Sections 545 and 2. More specifically,

1.     GROEB FARMS, INC., was the largest industrial honey supplier and packer in the United States, with its principal place of business in Onsted, Michigan and other processing and packing facilities, namely, Belleview, Florida; Colton, California; San Bernardino, California since December 2012; and from January through September 2011, Baytown, Texas. GROEB FARMS processed and sold honey to retail, foodservice, and industrial customers. In about March 2007, outside investors purchased a majority interest in GROEB FARMS and constituted a new Board of Directors with oversight functions.

2.     Executive A was a senior GROEB FARMS executive, who reported directly to GROEB FARMS' Board of Directors and exercised control, authority, responsibility, and supervision over GROEB FARMS, including its operations and executive management team. Executive A served as management's primary point of contact to the Board of Directors and communicated directly to the Board, GROEB FARMS' customers, and the public regarding GROEB FARMS' polices, positions, and practices on food safety and illegally transshipped and illegally misdeclared honey.

3.     Executive B was a senior GROEB FARMS executive who reported directly to Executive A and exercised control, authority, responsibility, and supervision over purchasing honey on behalf of GROEB FARMS.

1

4.    At times material to this Agreement, Executive A and Executive B were acting within the scope of their employment, with intent to benefit GROEB FARMS, and in the course of the discharge of their duties.

5.    Beginning no later than February 2008 and continuing until about April 2012, GROEB FARMS, as part of a fraudulent practice, received, bought, sold, and facilitated the transportation, concealment, and sale of merchandise, namely, at least approximately 1,578 container loads of Chinese-origin honey knowing the same to have been imported and brought into the United States contrary to law, namely, as part of a fraudulent practice in violation of Title 18, United States Code, Section 542, all in violation of Title 18, United States Code, Section 545.

6.    As part of the fraudulent practice, GROEB FARMS, acting through Executive A and Executive B, purchased Chinese-origin honey for processing at its facilities and sold that honey to its domestic customers as mislabeled non-Chinese honey, and at other times as Chinese honey, all while knowing that the honey had been falsely and fraudulently imported and entered into the United States in avoidance of U.S.-imposed antidumping duties and at times, honey assessment fees, including in the following means:

   a.    falsely and fraudulently declaring Chinese-origin honey as having originated from countries other than China, including Indonesia, Malaysia, Mongolia, Thailand, and Vietnam; and

   b.    falsely and fraudulently describing Chinese-origin honey as a product other than honey, including sugars and syrups.

7.    Beginning in or about 2008 and continuing through in or about 2012, GROEB FARMS instituted first-party onsite supply chain audits and inspections of manufacturers and suppliers. As part of the fraudulent practice, Executive A and Executive B:

   a.    continued to deliberately purchase honey from U.S.-based brokers receiving honey from Asian suppliers, including Suppliers 1, 2, 3, and 4, even after the audits raised substantial concerns that these overseas suppliers were providing GROEB FARMS with illegally transshipped and misdeclared Chinese-origin honey;

   b.    continued to deliberately purchase honey from another U.S.-based broker receiving honey from another Asian supplier, Supplier 5, even

2

after GROEB FARMS was refused access to Supplier 5's facilities to conduct onsite supply chain audits and inspections; and

c.     marketed and promoted GROEB FARMS' compliance with applicable laws, including its first-party supply chain audits and inspections, to customers and the public.

8.     As part of the fraudulent practice, GROEB FARMS, acting through Executive A and Executive B, knowingly obtained and caused others at GROEB FARMS to receive fake and fraudulent bills of lading, invoices, packing lists, country of origin certificates, and other papers, which records had been used to falsely and fraudulently declare Chinese-origin honey as having originated from countries other than China and at times, as sugars and syrups.

9.     As part of the fraudulent practice, GROEB FARMS, acting through Executive A and Executive B, provided false, fraudulent, and misleading representations to GROEB FARMS' (a) Board of Directors; (b) customers; and (c) the public regarding GROEB FARMS' involvement and participation in the knowing purchase, receipt, processing, mislabeling, and sale of Chinese-origin honey that falsely and fraudulently entered the United States in avoidance of U.S.-imposed antidumping duties and at times, honey assessment fees, and in so doing:

a.     maintained a corporate website containing false and fraudulent representations about its lack of involvement in illegal transshipping and customs fraud-related matters; and

b.     communicated by email and mass marketing material in furtherance of its fraudulent practices.

10.     As part of the fraudulent practice, GROEB FARMS and others, including Executive A and Executive B, misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the acts and the purposes of the acts done in furtherance of the their criminal activities.

11.     For the period from in or about February 2008 and continuing until about April 2012, as part of the fraudulent practice, GROEB FARMS caused losses to the United States of no less than $78,866,216.

## Exhibit B

## CORPORATE COMPLIANCE PROGRAM

Goods shipped from a country of origin to a country of intermediate destination, mislabeled as to country of origin, and that ultimately pass through a customhouse at the port of final destination and enter into the United States as a misdeclared product, are considered illegally "transshipped." Specifically, Chinese-origin honey imported into the United States through third countries and mislabeled and declared as originating from a third country is illegally "transshipped." Chinese-origin honey imported and entered into the United States as originating from a country other than China, even if not transshipped, is considered an illegally misdeclared product. Similarly, Chinese-origin honey imported and entered into the United States as a product other than honey, including, for example, molasses, fructose, rice syrup, glucose syrup, honey syrup, and apple juice concentrate is also considered an illegally misdeclared product. The United States assesses antidumping duties on Chinese-origin honey and honey assessment fees on all honey. Illegally transshipped, mislabeled, and misdeclared Chinese-origin honey can avoid these duties and fees, in violation of U.S. law. Furthermore, illegally transshipped, mislabeled, and misdeclared honey can create a two-tier pricing structure for honey: higher prices for buyers and sellers unwilling to transact in transshipped, mislabeled, and misdeclared honey and cheaper prices for those willing to do so or who are otherwise indifferent.

The Food, Drug, and Cosmetic Act ("FDCA") and Food Safety Modernization Act ("FSMA") are designed to ensure that foods are safe, wholesome, sanitary, and properly labeled.

The purpose of this Corporate Compliance Program is to ensure that GROEB FARMS, INC. maintains supply chain integrity and conducts reasonable, good-faith country-of-origin inquiries reasonably designed to ensure that GROEB FARMS is able to track and trace its domestic and imported products, as well as avoid transacting in illegally transshipped, illegally misdeclared, and unsafe or unwholesome products, including honey.

To prevent and address deficiencies in its policies and procedures regarding full compliance with U.S. importation and customs laws, the FDCA and FSMA, and other federal laws relating to honey and other products (collectively, the "traceability and food laws"), GROEB FARMS agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its internal controls, existing policies, and procedures.

1

Where necessary and appropriate, GROEB FARMS agrees to adopt new or to modify existing policies and procedures to ensure that it maintains a rigorous compliance code, standards, and procedures designed to detect and deter violations of the traceability and food laws. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of GROEB FARMS' existing policies and procedures:

1.      A clearly articulated corporate policy, adopted by formal resolution of GROEB FARMS' Board of Directors, against violations of the traceability and food laws. Among other things, the corporate policy shall make clear that it is a federal crime for anyone to fraudulently or knowingly import or bring into the United States, any merchandise contrary to law (including U.S. importation and customs laws, the FDCA and FSMA), or receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law.

2.      Promulgation of compliance standards and procedures designed to reduce the prospect of violations of the traceability and food laws and GROEB FARMS' compliance code and appropriate measures to encourage and support the observance of ethics and compliance standards and procedures against traceability violations at all levels of the company. These standards and procedures shall apply to all directors, officers, executives, and employees, and where necessary, appropriate, and practical, outside parties acting on behalf of or for the benefit of GROEB FARMS, including, but not limited to, agents, brokers, traders, representatives, manufacturers, producers, processors, distributors, teaming partners, joint venture partners, and others (collectively, "agents, brokers, and others").

3.      Development of these compliance standards and procedures, including ethics and compliance programs on the basis of a risk assessment addressing the individual circumstances of each honey purchasing transaction, including, but not limited to: (a) market conditions at the time of the transaction, as well as (b) reasonable country-of-origin and supply chain inquiries, including a review of the honey's:

(i) paperwork, markings, and labels, or lack, incompleteness, or tampering thereof;

(ii) verified container numbers;

(iii) drum conditions and color;

(iv) price;

(v) volume;

2

(vi) sales condition, including spot buy versus long-term contract;

(vii) claimed country of origin, including the honey production outputs of the claimed country, whether the claimed origin has been used as a transshipping route, and whether the country is a historic net consumer or exporter of its honey;

(viii) seller, agent, or broker and each's track record and business practices, including use of affiliates or third parties to import into the United States, a higher risk practice than directly serving as the importer of record;

(ix) claimed manufacturer, factory, producer, or processor and the good-faith due diligence and supply chain audits conducted thereof, if any, including the willingness and extent of access granted for the audits; thoroughness, scope, and frequency of the audits; and the training, expertise, and credibility of the auditor; and

(x) claimed importer of record and any information or background relating to the same.

4.      Periodic review of its compliance standards and procedures, including ethics and compliance programs, taking into account relevant developments in the field and evolving industry standards, and update and adapt as necessary to ensure the continued effectiveness of the company's ethics and compliance programs in detecting and reducing violations of the traceability and food laws and GROEB FARMS' compliance code.

5.      Mechanisms designed to ensure that GROEB FARMS' policies, standards, and procedures regarding the traceability and food laws are effectively communicated to all directors, officers, executives, and employees, and where necessary, appropriate, and practical, agents, brokers, and others.  These mechanisms shall include: (a) periodic training for all directors, officers, executives, and employees, and where necessary, appropriate, and practical, agents, brokers, and others; and (b) annual certifications by all such directors, officers, executives, and employees, and where necessary, appropriate, and practical, agents, brokers, and others, certifying compliance with the training requirements.

6.      An effective system for receiving, reporting, handling, and addressing suspected criminal conduct and/or violations of the compliance policies, standards, and procedures regarding the traceability and food laws for directors, officers, executives, and employees, and where necessary, appropriate, and practical, agents, brokers, and others, as to known complaints that arise internally and externally of the company.

7.      Appropriate disciplinary procedures to address, among other things,

3

violations of the traceability and food laws and GROEB FARMS' compliance code by GROEB FARMS' directors, officers, executives, and employees, and where necessary, appropriate, and practical, agents, brokers, and others. GROEB FARMS shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent future similar misconduct, including assessing the ethics and compliance program and making modifications as necessary to ensure the program is effective.

8.      Appropriate due diligence and compliance requirements pertaining to the retention and oversight of agents, brokers, and others, including: (a) informing agents, brokers, and others of GROEB FARMS' commitment to abiding by the traceability and food laws, and of GROEB FARMS' ethics and compliance standards and procedures or other measures for preventing and detecting violations of those laws; and (b) seeking a reciprocal commitment from agents, brokers, and others.

9.      Standard provisions in agreements, contracts, and renewals thereof with all agents, brokers, and others that are reasonably calculated to prevent violations of the traceability and food laws, which may, depending upon the circumstances, include: (a) traceability representations and undertakings relating to compliance with the traceability and food laws; (b) rights to conduct supply chain audits of the agents, brokers, and others to ensure compliance with the foregoing; and (c) rights to terminate an agent or broker as a result of any breach of the traceability and food laws, and regulations or representations and undertakings related to such matters.

10.     Educating GROEB FARMS' customers of GROEB FARMS' polices and procedures regarding the traceability and food laws to better prevent GROEB FARMS' customers from buying or otherwise transacting in illegally transshipped, illegally misdeclared, and unsafe or unwholesome products, including honey.

# **Appendix A**

FEB 1 2 2013

JUDGE KENDALL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAGISTRATE JUDGE COX

UNITED STATES OF AMERICA ) 
                                )
        v.                     ) No.  **13CR0137**
                                )
GROEB FARMS, INC.          ) Violation: Title 18, United States
                                ) Code, Sections 545 and 2
                                )

The UNITED STATES ATTORNEY charges:

At times material to this information:

1.    The United States Department of Commerce was charged with regulating commerce in the United States, and as part of its responsibilities had the authority to impose duties on certain foreign imports. One type of duty the Department of Commerce imposed was known as an "antidumping duty." Dumping occurred when foreign merchandise was sold in the United States at less than fair market value and when U.S. industries were injured. Antidumping duties were intended to ensure fair competition between United States companies and foreign industry, and to counter international price discrimination that caused injury to United States industries from "dumping."

2.    In December 2001, the Department of Commerce determined that Chinese-origin honey was being sold into the United States at less than fair market value. As a result, the United States government imposed default antidumping duties on Chinese-origin honey. From about mid-June 2006 through about

mid-July 2007 antidumping duties on Chinese-origin honey were approximately 212% of the declared value of the imported honey and thereafter, from about mid-July 2007 through about mid-July 2008, were approximately 221%. Beginning in about July 2008 antidumping duties on Chinese honey were assessed against the entered net weight of the imported honey, first at $2.06 per net kilogram and, later, from about January 2009 to the present, at $2.63 per net kilogram, in addition to a "honey assessment fee" of one cent per pound on all honey.

3. The United States Department of Homeland Security, Bureau of Customs and Border Protection (CBP), was responsible for, among other things, the examination of merchandise entering the United States to ensure that it was admissible under and in compliance with United States laws, and the assessment and collection of taxes, fees, and duties on imported merchandise, including antidumping duties.

4. CBP entry forms 3461 (Entry/Immediate Delivery) and 7501 (Entry Summary) required importers to provide specific and truthful information relating to imported merchandise, including a description of the merchandise and the merchandise's harmonized tariff code, manufacturer, value, and country of origin. A customhouse broker or agent normally handled the process of entering goods into the United States on behalf of an importer, which included filing entry documents with CBP based on information provided by the importer.

5.    Chinese-origin honey imported and entered into the United States through a third country other than China, and mislabeled and declared as originating from that third country was illegally "transshipped." Chinese-origin honey imported and entered into the United States as originating from a country other than China, even if not transshipped, was considered an illegally misdeclared product. Similarly, Chinese-origin honey imported and entered into the United States as a product other than honey, including, molasses, fructose, rice syrup, glucose syrup, honey syrup, and apple juice concentrate (collectively "sugars and syrups") was also considered an illegally misdeclared product. When CBP was misled about the Chinese origin of honey or its description, it would not know to impose the required antidumping duties on the illegally transshipped or illegally misdeclared honey.

6.    Defendant GROEB FARMS, INC., was the largest industrial honey supplier and packer in the United States, with its principal place of business in Onsted, Michigan and other processing and packing facilities, namely, Belleview, Florida; Colton, California; San Bernardino, California since December 2012; and from January through September 2011, Baytown, Texas.   GROEB FARMS processed and sold honey to retail, foodservice, and industrial customers. In about March 2007, outside investors purchased a majority interest in GROEB FARMS and constituted a new Board of Directors with oversight functions.

3

7.      Executive A was a senior GROEB FARMS executive, who reported directly to GROEB FARMS' Board of Directors and exercised control, authority, responsibility, and supervision over GROEB FARMS, including its operations and executive management team. Executive A served as management's primary point of contact to the Board of Directors and communicated directly to the Board, GROEB FARMS' customers, and the public regarding GROEB FARMS' polices, positions, and practices on food safety and illegally transshipped and illegally misdeclared honey.

8.      Executive B was a senior GROEB FARMS executive who reported directly to Executive A and exercised control, authority, responsibility, and supervision over purchasing honey on behalf of GROEB FARMS.

9.      Beginning no later than February 2008 and continuing until about April 2012, GROEB FARMS, as part of a fraudulent practice, received, bought, sold, and facilitated the transportation, concealment, and sale of merchandise, namely, at least approximately 1,578 container loads of Chinese-origin honey knowing the same to have been imported and brought into the United States contrary to law, namely, as part of a fraudulent practice in violation of Title 18, United States Code, Section 542, all in violation of Title 18, United States Code, Section 545.

10.      As part of the fraudulent practice, GROEB FARMS, acting through Executive A and Executive B, purchased Chinese-origin honey for processing at its facilities and sold that honey to its domestic customers as mislabeled non-Chinese

4

honey, and at other times as Chinese honey, all while knowing that the honey had been falsely and fraudulently imported and entered into the United States in avoidance of U.S.-imposed antidumping duties and at times, honey assessment fees, including in the following means:

    a.    falsely and fraudulently declaring Chinese-origin honey as having originated from countries other than China, including Indonesia, Malaysia, Mongolia, Thailand, and Vietnam; and

    b.    falsely and fraudulently describing Chinese-origin honey as a product other than honey, including sugars and syrups.

    11.    Beginning in or about 2008 and continuing through in or about 2012, GROEB FARMS instituted first-party onsite supply chain audits and inspections of manufacturers and suppliers. As part of the fraudulent practice, Executive A and Executive B:

    a.    continued to deliberately purchase honey from U.S.-based brokers receiving honey from Asian suppliers, including Suppliers 1, 2, 3, and 4, even after the audits raised substantial concerns that these overseas suppliers were providing GROEB FARMS with illegally transshipped and misdeclared Chinese-origin honey;

    b.    continued to deliberately purchase honey from another U.S.-based broker receiving honey from another Asian supplier, Supplier 5, even after GROEB FARMS was refused access to Supplier 5's facilities to conduct onsite supply chain audits and inspections; and

    c.    marketed and promoted GROEB FARMS' compliance with applicable laws, including its first-party supply chain audits and inspections, to customers and the public.

    12.    As part of the fraudulent practice, GROEB FARMS, acting through Executive A and Executive B, knowingly obtained and caused others at GROEB

FARMS to receive fake and fraudulent bills of lading, invoices, packing lists, country of origin certificates, and other papers, which records had been used to falsely and fraudulently declare Chinese-origin honey as having originated from countries other than China and at times, as sugars and syrups.

13. As part of the fraudulent practice, GROEB FARMS, acting through Executive A and Executive B, provided false, fraudulent, and misleading representations to GROEB FARMS' (a) Board of Directors; (b) customers; and (c) the public regarding GROEB FARMS' involvement and participation in the knowing purchase, receipt, processing, mislabeling, and sale of Chinese-origin honey that falsely and fraudulently entered the United States in avoidance of U.S.-imposed antidumping duties and at times, honey assessment fees, and in so doing:

   a. maintained a corporate website containing false and fraudulent representations about its lack of involvement in illegal transshipping and customs fraud-related matters; and

   b. communicated by email and mass marketing material in furtherance of its fraudulent practices.

14. As part of the fraudulent practice, GROEB FARMS and others, including Executive A and Executive B, misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the acts and the purposes of the acts done in furtherance of the their criminal activities.

6

15.     For the period from in or about February 2008 and continuing until about April 2012, as part of the fraudulent practice, GROEB FARMS caused losses to the United States of no less than $78,866,216.

16.     On or about January 25, 2010, in the Northern District of Illinois, Eastern Division and elsewhere,

GROEB FARMS, INC.

defendant herein, together with Executive A and Executive B, and others known and unknown, as part of a fraudulent practice, received and bought merchandise, namely, twenty-two container loads of Chinese-origin honey with a contract value of $882,178, knowing the same to have been imported and brought into the United States contrary to law, namely, as part of a fraudulent practice in violation of Title 18, United States Code, Section 542, in that the honey was falsely and fraudulently imported and brought into the United States described as Chinese honey syrup, some of which was transported through the Northern District of Illinois and later delivered into the Northern District of Illinois as finished product.

In violation of Title 18, United States Code, Sections 545 and 2.


_____

UNITED STATES ATTORNEY

7